No. 91,997

IN THE MATTER OF THE ADOPTION OF B.G.J.

(133 P.3d 1)

Opinion filed April 28, 2006.

*Margie J. Phelps*, of Topeka, argued the cause, and *Rachel I. Hockenbarger*, of Phelps-Chartered, of Topeka, was with her on the briefs for appellant Prairie Band Potawatomi Nation.

*Martin W. Bauer*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, argued the cause, and *Teresa L. Mah*, of the same firm, and *Michael J. Belfonte*, of Michael J. Belfonte, P.C., of Kansas City, Missouri, were with him on the briefs for appellees adoptive parents.

*Jill Bremyer-Archer* and *Casey R. Law*, of Bremyer & Wise, L.L.C., of McPherson, were on the brief for *amici curiae* American Academy of Adoption Attorneys.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an adoption proceeding in which R.B.F. and L.M.F. petitioned the district court to adopt B.G.J., who is an Indian child within the meaning of the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1903(4)(b) (2000). The Prairie Band Potawatomie Nation (Tribe) intervened in the proceeding and objected to the adoption. The district court determined that good cause existed for deviating from the adoptive placement preferences of ICWA and granted the petition for adoption of B.G.J. by non-Indian parents. The Court of Appeals affirmed. *In re Adoption of B.G.J.*, 33 Kan. App. 2d 894, 111 P.3d 651 (2005). The Tribe's petition for review was granted.

## ISSUES

1. WHAT IS THE PROPER STANDARD OF APPELLATE REVIEW FOR THE DISTRICT COURT'S DETERMINATION THAT GOOD CAUSE EXISTS TO DEVIATE FROM THE ADOPTIVE PLACEMENT PREFERENCES OF ICWA?

2. DID THE DISTRICT COURT ERR IN DETERMINING WHETHER THERE WAS GOOD CAUSE TO DEVIATE FROM THE ICWA PLACEMENT PREFERENCES?

3. IS THE EXISTING INDIAN FAMILY DOCTRINE AT ISSUE IN THIS CASE?

## FACTS

The district court made findings of fact and conclusions of law. The district court described its findings as "the material and controlling facts relevant to the Decision, which have been established by clear and convincing evidence." On appeal, the Tribe did not challenge the district court's findings of fact. They are the basis for the following statement of facts:

B.G.J. was born June 4, 2003, in Topeka, Kansas. She is one-fourth Native American and is eligible for enrollment as a member of the Tribe.

T.J. is the biological mother of B.G.J. and six other children. She is single. T.J. is descended from Potawatomie ancestors and is one-half Native American. Neither T.J. nor any of her children have lived on a reservation. But T.J. is an enrolled member of the Tribe

and has received benefits as a member, including medical and dental care, a grant, a computer, groceries, and payment of utilities.

B.G.J.'s father is an African-American that T.J. met in a bar in Texas. His identity and whereabouts are unknown. Paternity for B.G.J. was never established; the parental rights of the unidentified African-American male were terminated by the district court on July 28, 2003. T.J. was not married when B.G.J. was conceived.

On June 5, 2003, B.G.J.'s mother, T.J., met with a person from an adoption agency called Adoption of Babies and Children. At that meeting T.J. said that B.G.J. was eligible for enrollment in the Tribe. The same day the adoption agency faxed a letter to the Tribe advising that T.J. had relinquished B.G.J. to the agency for adoption. The letter stated that T.J. was enrolled in the Tribe and that B.G.J. was eligible for enrollment.

The Tribe expressed its intent to seek custody of B.G.J. for placement in a Tribe foster home facility in Topeka or a group home on the reservation. The Tribe stated that it was prepared to take immediate custody of B.G.J. and to arrange for her care and placement.

The adoption agency placed B.G.J. in foster care upon her release from the hospital on June 5. When T.J. executed a relinquishment of custody form on June 23, 2003, the adoption agency placed B.G.J. with R.B.F. and L.M.F., her adoptive parents.

T.J. voluntarily relinquished custody of B.G.J. to the adoption agency. The voluntary relinquishment was executed in writing by T.J. more than 10 days after the birth of B.G.J. It was acknowledged before a district magistrate judge who certified that he explained the terms and consequences of the relinquishment and T.J. understood his explanation.

T.J. knew the placement preferences of ICWA when she executed the relinquishment. She understood that she could have placed B.G.J. with a member of her extended family, a member of the Tribe, or a member of another Indian tribe.

Neither T.J. nor any of her children follow the religion, culture, customs, and practices of the Tribe. Neither T.J. nor any of her children participate in any tribal affairs.

From profiles provided by the adoption agency, T.J. selected R.B.F. and L.M.F. to be adoptive parents of B.G.J. T.J. did not want a member of the Tribe to raise B.G.J. Instead, she wanted R.B.F. and L.M.F. to raise her.

R.B.F. and L.M.F. are husband and wife. They live in Edmond, Oklahoma. They are not Native Americans. They have two biological children. They have been foster parents for 32 other children. R.B.F. is a casualty loss claims adjuster, and L.M.F. is employed at the University of Oklahoma College of Medicine.

An Oklahoma-licensed social worker completed a written social assessment of R.B.F. and L.M.F., as required by K.S.A. 59-2132(f). The assessment states they are of good character and reputation in the community in which they live; they have sufficient financial means and ability to raise and educate B.G.J.; they are capable of assuming the care, management, control, and education of B.G.J.; and they are willing to assume such obligations. The adoption agency has executed an agency consent to the adoption of B.G.J. by R.B.F. and L.M.F.

There is no Prairie Band Potawatomie Nation tribe in Oklahoma with which B.G.J. can be affiliated. There is a Citizen Potawatomie Nation Indian tribe in Oklahoma, but its heritage and culture differs from the Prairie Band Potawatomie Nation and B.G.J. may not qualify for enrollment.

By enrolling in the Tribe, B.G.J. would be eligible to receive financial and educational benefits at the Early Childhood Education Center on the reservation at Mayetta, Kansas.

The Tribe offered placements for B.G.J. with the following relatives of T.J.:

Robin Guerrero is T.J.'s aunt. She is single. She is employed as a secretary and office manager for the Tribe. Her mother and a nephew live in her home. She is an enrolled member of the Tribe, but she does not live on the reservation. She lives 20 minutes from Topeka. She became qualified as a foster care provider for Kansas Children's Service League in March 2002 and has had one placement. She provided no social assessment.

Roberta Guerrero is T.J.'s half sister. She is single. She is employed in a nursing home. She lives in a one-bedroom house. She

is a lifetime enrolled member of the Tribe, but she does not live on the reservation. She did not know of the birth of B.G.J. until the day before the hearing on December 16, 2003, when she was told by her daughter. She provided no social assessment.

Jennifer Herrera is T.J.'s sister. She is married with eight children—five are hers and three are her husband's. She lives in a four-bedroom house with one and one-half bathrooms. She has been an enrolled member of the Tribe for 25 to 30 years. She does not live on the reservation. Her religion is Baptist. She has cared for a brother and two girls and has acted as guardian for a nephew. She learned of B.G.J. the week before the December 16 hearing. She provided no social assessment.

Yvonne Castro-Hoss is T.J.'s cousin. She is married and has a 17-year-old daughter. She lives in a two-bedroom house. She works as a clerk in the Shawnee County District Court Clerk's office assigned to Juvenile and Probate. She does not live on the reservation. Her husband works for the Tribe. Neither she nor her husband are Native Americans. She provided no social assessment.

## DISCUSSION

### Federal Statutes and Guidelines

25 U.S.C. § 1903(4) defines an "Indian child" as an "unmarried person who is under age eighteen and . . . (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." B.G.J. is an Indian child within the meaning of ICWA.

25 U.S.C. § 1915(a) (2000) provides: "In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." The Bureau of Indian Affairs published guidelines for state courts' implementation of ICWA. 44 Fed. Reg. 67,584 (Nov. 1979). Guideline F.3 states the following with regard to good cause to modify the statutory preferences:

"(a) For purposes of foster care, preadoptive or adoptive placement, a determination of good cause not to follow the order of preference . . . shall be based on one or more of the following considerations:

(i) The request of the biological parents or the child when the child is of sufficient age.

(ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.

(iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.

"(b) The burden of establishing the existence of good cause not to follow the order of preferences . . . shall be on the party urging that the preferences not be followed." 44 Fed. Reg. 67,594 (Nov. 1979).

### District Court Ruling

Heeding the guidelines, the trial court placed the burden of proving "good cause to the contrary" on R.B.F. and L.M.F., who were asking the court to deviate from ICWA adoption placement preferences. The trial court noted that the standard of proof differs from state to state: "[F]or example, Alaska requires a 'preponderance of the evidence,' standard (*Adoption of N.P.S.*, 868 P.2d 934 [Alaska, 1994], while Minnesota requires a 'clear and convincing evidence' standard (*Matter of Custody of S.E.G.*, 507 N.W.2d 872 [Minn. App., 1993])." The trial court further noted that in the absence of a Kansas appellate court decision on the standard of proof, it would apply a clear-and-convincing-evidence standard. The standard of proof has not been raised as an issue on appeal.

With regard to the factors identified in the guidelines, the trial court determined that the second factor did not apply in this case. There is no contention that B.G.J. has extraordinary physical or emotional needs.

The first factor, the trial court found "is well established from the Mother's testimony. She does not want the Child reared by her extended family or any other member of the Tribe." The trial court stated: "[T.J.] knew her extended family long before her seventh child, [B.G.J.], was born. When she decided she could not rear the Child, she knew the background and parenting skills of the members of her extended family and she was adamant not to allow them to have placement of the Child." The trial court concluded that

T.J.'s "parental preference is respected by the 'good cause' exception in the ICWA and BIA Guidelines."

The third factor, the trial court stated, requires it "to make a determination whether there is a suitable family placement available for the child which meets the adoptive placement criteria." From the testimony of those extended family relatives the Tribe proposed for placement of B.G.J., the trial court found that none were suitable. The trial judge noted that, even though three of the four are tribal members, none live on the Tribe's reservation or participate in its cultural or religious practices.

Although he noted that the courts of Montana and Minnesota limit analysis to the BIA guidelines factors, the trial judge agreed with the courts of Oklahoma, Alaska, and Washington in concluding that those factors are not exhaustive. In addition to the BIA factors, the trial court considered the best interest of the child and the bonding between the child and the adoptive parents.

The trial court made the following conclusions of law:

"1. The court has jurisdiction of the subject matter and venue is with this court.

"2. The Indian Child Welfare Act applies to the above entitled adoption proceeding.

"3. The Tribe was given timely notice of this proceeding and has been allowed to intervene.

"4. The court conducted an evidentiary hearing and has considered the Tribe's Objection to the proposed adoption of the Child.

"5. The Tribe failed to offer suitable placements for the Child. The persons identified for placement of the Child do not offer the Child a distinctive Indian environment in which to be reared. None of them live on the PBPN reservation or practice their Indian heritage. None professed to follow the Drum religion of the Tribe. Jennifer Herrera stated she is a member of the Baptist faith. Neither Yvonne Castro-Hoss or her husband are Native Americans. None of the persons offered as placements provided social assessments.

"6. [R.B.F. and L.M.F.] have shown 'good cause to the contrary' for deviating from the placements preferences under the ICWA. The Mother has a strongly stated preference for [R.B.F. and L.M.F.] as adoptive parents. She knew and considered members of her extended Indian family for placement and consciously rejected them in favor of [R.B.F. and L.M.F.]. The Child has admittedly bonded with [R.B.F. and L.M.F.] with whom she has been placed since June 24, 2003. The court has concluded the placements offered by the Tribe unsuitable for the reasons previously stated.

"7. [R.B.F. and L.M.F.] are suitable to adopt the Child. They are experienced parents and foster parents. They are socially and economically stable and can afford to rear the Child. They have provided a social assessment from a licensed social worker which recommends them for adoption of the Child. It is in the Child's best interest that she be adopted by [R.B.F. and L.M.F.]."

## Court of Appeals Decision

The threshold issue on appeal was the standard to be applied by the appellate court when reviewing the district court's determination of good cause. The Court of Appeals stated:

"Our research reveals that Kansas appellate courts have not previously said what standard is to be applied when reviewing a district court's finding of good cause to deviate from the Indian Child Welfare Act's placement preferences. The Tribe claims the district court's decision should be reviewed de novo. The adopting parents argue that this court should review the district court's decision with an abuse of discretion standard, citing cases arising outside of this jurisdiction for support.

"Indeed, other jurisdictions have applied an abuse of discretion standard of review to this issue. See, e.g., Matter of Adoption of F.H., 851 P.2d 1361, 1363 (Alaska 1993) (good cause determination within court's discretion and will be reversed only if court abused its discretion or if controlling factual findings clearly erroneous); Matter of Appeal in Maricopa County, 136 Ariz. 528, 534, 667 P.2d 228 (Ct. App. 1983) (applying abuse of discretion standard when reviewing the district court's deviation from placement preferences); Adoption of M, 66 Wash. App. 475, 482, 832 P.2d 518 (1992) (good cause is a matter of discretion).

"We think the use of the term 'good cause,' without further legislative definition was designed to provide state courts with some flexibility in determining the proper placement of Indian children. Good cause is a matter of discretion to be exercised in light of many factors, including but not necessarily limited to the best interest of the child, the wishes of the biological parents, the suitability of the persons referred for placement, the child's ties to the tribe, and the child's ability to make any cultural adjustments necessitated by a particular placement. Adoption of M, 66 Wash. App. at 482 n.5. Because flexibility implies discretion, we will employ an abuse of discretion standard of review." 33 Kan. App. 2d at 899-900.

## Standard of Review

Although conceding that Congress intended state courts to have some flexibility in adoptive placements of Indian children, the Tribe objects to application of the very broad abuse of discretion standard of review. As an alternative, the Tribe recommends the approach taken by a California appellate court in *Fresno County*

*Dept. of Children & Family Services v. Superior Court*, 122 Cal. App. 4th 626, 19 Cal. Rptr. 3d 155 (2004).

In *Fresno County*, the appellate court favored review of the trial court's decision as a factual matter rather than as a legal conclusion. It applied a substantial evidence standard of review:

"Both the abuse of discretion test and the substantial evidence test entail considerable deference to the fact-finding tribunal. [Citation omitted.] The former centers upon legal principles—whether, in light of the record, the trial court's ruling falls within the permissible range of options set by the legal criteria—while the latter centers upon evidentiary proof—whether the trial court's factual conclusions are rationally supported by record evidence. [Citation omitted.]

"Given the prime importance under ICWA of placement of an Indian child with an Indian family [citation omitted], a court's finding of good cause does not appear based in an exercise of discretion. ICWA in this regard does not contemplate a balancing of various competing interests [citation omitted]. Rather, a court's finding of good cause amounts to an exception to the rule preferring placement of an Indian child with an Indian family. Thus, it is not akin to a traditional custody decision under California law in which a court balances competing claims. [Citation omitted.] Indeed, according to the congressional declaration of policy at the outset of ICWA (25 U.S.C. § 1902), ICWA is designed to protect the best interests of Indian children." 122 Cal. App. 4th at 645.

With regard to applying the standard, the California court stated that

"the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. [Citation omitted.] All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the decision, if possible. We may not reweigh or express an independent judgment on the evidence. [Citation omitted.] In this regard, issues of fact and credibility are matters for the trial court alone. [Citation omitted.]" 122 Cal. App. 4th at 646.

Kansas courts, in civil cases where a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, apply a standard of review virtually identical to what the California court calls a substantial evidence standard:

"[I]t is not the function of the appellate court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing

party, supports the verdict, it will not be disturbed on appeal. [Citation omitted.]" *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 478, 15 P.3d 338 (2000).

R.B.F. and L.M.F. direct the court's attention to decisions from Idaho and Alaska, *Matter of Baby Boy Doe*, 127 Idaho 452, 902 P.2d 477 (1995), and one of the cases cited by the Court of Appeals, *Matter of Adoption of F.H.*, 851 P.2d 1361 (Alaska 1993), in support of an abuse of discretion standard for reviewing a determination of good cause to deviate from ICWA placement preferences. In considering the question whether good cause existed to avoid ICWA placement preferences in the adoption of Baby Boy Doe, the Idaho Supreme Court decided that an abuse of discretion standard of review was appropriate:

"Regarding our standard of review, we first note that the House Report in the legislative history states the following regarding 25 U.S.C. § 1915(a):

'Subsection (a) provides that, in the absence of good cause to the contrary, a preference shall be given to adoptive placement of an Indian child with the extended family; a member of the child's tribe; or another Indian family. This subsection and subsection (b) establish a Federal policy that, where possible, an Indian child should remain in the Indian community, *but is not to be read as precluding the placement of an Indian child with a non-Indian family.*'

H. R. Rep. No. 1386, 95th Cong. 2nd Sess. 22 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7546. The introductory language to the BIA guidelines regarding ICWA states that 'use of the term "good cause" was designed to provide state courts with flexibility in determining the disposition of a placement proceeding . . . .' 44 Fed. Reg. 67584 (1979), *citing* S. Rep. No. 597, 95th Cong., 1st Sess. 17 (1977). In view of the trial court's superior position to ascertain the facts, and the flexibility Congress intended trial courts to have regarding the 'good cause' determination, we believe this determination should be commended to the sound discretion of the trial court, and will not be upset on appeal absent an abuse of discretion. [Citations omitted.] Accordingly, we consider 'whether the trial court (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the available choices; and (3) reached its decision by an exercise of reason.' [Citation omitted.]" *Matter of Baby Boy Doe*, 127 Idaho at 461-62.

The Alaska Supreme Court stated:

"We will reverse an adoptive placement preference determination only if convinced that the record as a whole reveals an abuse of discretion or if controlling factual findings are clearly erroneous. [Citation omitted.] Abuse of discretion is established if the superior court considered improper factors or improperly

weighted certain factors in making its determination. [Citation omitted.]" *Matter of Adoption of F.H.*, 851 P.2d at 1363.

In its decision, the Court of Appeals cited the Alaska case relied on by R.B.F. and L.M.F. and cases from Arizona and Washington. In *Matter of Appeal in Maricopa County*, 136 Ariz. 528, 667 P.2d 228 (Ct. App. 1983), the Arizona Court of Appeals affirmed the judgment of the trial court granting a final order of adoption. With regard to its standard of review, the Court of Appeals stated:

"Here, the trial court exercised its discretion in weighing the failure to comply with the [ICWA] once the paternity of the father was established and the tribal interest in the child against the fact that the baby girl had resided with the adoptive mother for three years; that a close mother-child relationship with the adoptive mother had been established; and that the baby's removal would cause psychological damage. These findings were supported by evidence and therefore the trial court did not abuse its discretion in ordering the adoption of the child. Under these circumstances, we find no abuse of discretion in the decision of the trial court declining to follow the preferences for adoptive placement." 136 Ariz. at 534.

The Washington case cited by the Court of Appeals is one in which the trial court ruled that ICWA did not apply. See *Adoption of M,* 66 Wash. App. 475, 832 P.2d 518 (1992). The appellate court reversed, holding that ICWA did apply, and remanded so that all interested parties could be heard on the question of good cause to deviate from the statutory placement preferences. 66 Wash. App. at 483. The appellate court set out principles to be followed upon remand, including that "[g]ood cause is a matter of discretion." 66 Wash. App. at 482 (citing *Maricopa County*, 136 Ariz. at 534). The appellate court added:

"[W]e emphasize, prior to remanding the case, that the provisions of the [ICWA] vest the trial court with ample discretion to allow the child to remain permanently in the home selected by both natural parents and in which she has lived since birth. Exercise of that discretion, however, must be based upon a finding of good cause for non-preferential placement pursuant to 25 U.S.C. § 1915(a)." 66 Wash. App. at 483.

None of the cases cited by the Tribe or the Court of Appeals for the abuse of discretion standard of review quantifies discretion quite like this court has at various times. For example, in *State v.*

*Lumbrera*, 252 Kan. 54, Syl. ¶ 5, 845 P.2d 609 (1993), the court stated:

"Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only when no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said the trial court abused its discretion."

And more recently, with regard to allowing prejudgment interest, the court has simply stated that "[j]udicial discretion is abused only when no reasonable person would take the view adopted by the trial court." *Varney Business Services, Inc. v. Pottroff*, 275 Kan. 20, 44, 59 P.3d 1003 (2002). However, in *Saucedo v. Winger*, 252 Kan. 718, 729-32, 850 P.2d 908 (1993), this court recognized degrees of judicial discretion depending on the circumstances. As the court stated, "[a] high degree of appellate deference is allowed a trial judge's exercise of discretion in assessing the texture and feel of the trial, the credibility of witnesses, and the perceived impact of an allegedly prejudicial event." 252 Kan. at 731. But, if a constitutional or a statutory right is involved, then

"the trial judge's use of discretion is limited. Under these circumstances there is a greater need for articulation by the trial judge of the reasons for his 'discretionary' decision. Discretion must be exercised, not in opposition to, but in accordance with, established principles of law. It is not an arbitrary power." 252 Kan. at 731.

In *Dragon v. Vanguard Industries, Inc.*, 277 Kan. 776, 779-80, 89 P.3d 908 (2004), noting *Winger*, we held the district court had substantial discretion in certifying a class action. We said:

" 'Trial judges are afforded substantial discretion in determining whether a class should be certified.' *Bigs v. City of Wichita*, 271 Kan. 455, 477, 23 P.3d 855 (2001). As we noted in *Saucedo v. Winger*, 252 Kan. 718, 730-32, 850 P.2d 908 (1993), ' "the amount and degree of judicial discretion will vary depending on the character of the question presented for determination." ' 252 Kan. at 731 (quoting Wallach, *Judicial Discretion: How Much*, in Judicial Discretion 12 [Smithburn 1991]). In general, when a discretionary decision is made 'within the legal standards and takes the proper factors into account in the proper way, the [trial court's] decision is protected even if not wise.' Davis, *Standards of Review: Judicial Review of Discretionary Decisionmaking*, 2 J. App. Prac. & Process 47, 59 (2000). However, '[a]buse is found when the trial court has gone outside the framework of legal standards or statutory limitations, or when it fails to properly consider the

factors on that issue given by the higher courts to guide the discretionary determination.' 2 J. App. Prac. & Process at 59. See Friendly, *Indiscretion about Discretion*, 31 Emory L.J. 747, 763 (1982); Rosenberg, *Judicial Discretion of the Trial Court, Viewed from Above*, 22 Syracuse L. Rev. 635 (1971); Schroeder, *Appellate Justice Today: Fairness or Formulas*, Wis. L. Rev. 9, 24 (1994).

"Applying these principles in the context of the discretionary decision to certify a class, the United States Supreme Court has explained 'this discretion is not unlimited, and indeed is bounded by the relevant provisions of the . . . Rules.' *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100, 68 L. Ed. 2d 693, 101 S. Ct. 2193 (1981). In another case, the Court explained its reversal of the discretionary decision: 'We do not, of course, judge the propriety of a class certification by hindsight. The District Court's error in this case . . . is the failure to evaluate carefully the legitimacy of the named plaintiff's plea . . . .' A class should be certified only '*after a rigorous analysis*, that the prerequisites of Rule 23(a) have been satisfied.' *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160-61, 72 L. Ed. 2d 740, 102 S. Ct. 2364 (1982).

"While the trial court has substantial discretion in determining whether a class should be certified, the provisions of K.S.A. 2003 Supp. 60-223 must be applied and rigorously analyzed." 277 Kan. at 779-80.

The abuse of discretion review adopted by the Supreme Courts in Idaho, Alaska, and Arizona is similar to the substantial abuse of discretion we adopted in *Dragon*. The difference is basically one of semantics rather than substance. As the California Supreme Court noted in *Fresno County*, the abuse of discretion test and the substantial evidence test both give considerable deference to the district court's finding of facts. Thus, the factual findings must be scrutinized in either test. We conclude that our standard of review of the good cause finding to deviate from the Indian Child Welfare Act's placement preferences is substantial abuse of discretion. Substantial discretion is abused when the district court fails to properly apply the ICWA factors in making its findings of fact rendering the findings clearly erroneous.

## Good Cause Determination

In this case, the trial court's findings are not challenged by the Tribe. Determinations of fact not appealed from are final and conclusive. *In re Marriage of Phillips*, 274 Kan. 1049, 1050, 58 P.3d 680 (2002). In the second issue of this review, the Tribe questions whether the trial court placed too much weight on the birth

mother's placement preference. In doing so, the Tribe questions whether the trial court's findings are sufficient to support its conclusion that R.B.F. and L.M.F. established good cause to deviate from the statutory placement preference.

The district court's material conclusions of law were that (1) the Tribe failed to offer suitable placements for B.G.J., (2) R.B.F. and L.M.F. showed good cause to deviate from the ICWA placement preferences, and (3) R.B.F. and L.M.F. were suitable to adopt B.G.J. The factual showing made by R.B.F. and L.M.F. on which material conclusion (2) was based included, among other things, the birth mother's "strongly stated preference for [R.B.F. and L.M.F.] as adoptive parents."

25 U.S.C. § 1915(c) (2000), provides in part: "Where appropriate, the preference of the Indian child or parent shall be considered." The Tribe contends that appropriateness must be assessed in light of the congressional intent in enacting the statute. That intent is to protect the best interest of Indian children and promote the stability of Indian tribes and families (25 U.S.C. § 1902 [2000]). Although placing Indian children with Indian families is a priority under ICWA, by providing for good cause to deviate from the placement preferences allows the state courts flexibility in the placement of Indian children. ICWA factors must be considered, but they are not exhaustive. The best interest of the child remains the paramount consideration, with ICWA preferences an important part of that consideration. But as noted earlier, BIA Guideline F.3 specifically provides that good cause not to follow the ICWA statutory preferences can be based on parental preference. It states that the good cause determination "shall be based on *one* or more of the considerations." (Emphasis added.) It does not limit the consideration which may be given to the mother's preference. Here, the mother knowingly and with full knowledge of the ICWA preferences executed her relinquishment. She was adamant that her child be placed with the adoptive parents, and not with her extended family or the Tribe.

B.G.J. had no extraordinary physical or emotional needs. Hence, the trial court based its determination on the other two factors. Giving as much if not more weight to the unavailability of suitable

families offered by the Tribe for placement as to the birth mother's request, the trial court determined that good cause existed to deviate from the statutory preferences. The trial court's analysis is in accord with the federal statutes and guidelines. We hold the district court did not abuse its discretion in finding that good cause existed to deviate from ICWA's placement preferences.

Finally, we note the Tribe's argument relative to the existing Indian family doctrine. This doctrine is the basis for some courts to refuse to apply the ICWA preferences in certain cases where the child is not part of an existing Indian family.

At the end of its opinion, the Court of Appeals addressed the Tribe's invitation to reject the existing Indian family doctrine:

"The Tribe makes an extensive argument against the existing Indian family doctrine, which was first established in *In re Adoption of Baby Boy L.*, 231 Kan. 199, [643 P.2d 168 (1982),] and recently reiterated in *In re J.J.G.*, 32 Kan. App. 2d 448, 452-53, 83 P.3d 1264 (2004). In *Baby Boy L.*, our Supreme Court held that the purpose of the Indian Child Welfare Act 'was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, and probably never would be, should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of its non-Indian mother.' 231 Kan. at 206.

"But the Tribe acknowledges the district court did not use this doctrine to find the Act inapplicable to this case. Indeed, the court found the Indian Child Welfare Act applied but that good cause existed not to follow its placement preferences. Really, the Tribe simply urges this court to reject the doctrine. This we cannot do as this court is duty bound to follow Kansas Supreme Court precedent in the absence of some indication that the court is departing from its previous position. See *Pruter v. Larned State Hospital*, 28 Kan. App. 2d 302, 312, 16 P.3d 975 (2000), *aff'd* 271 Kan. 865, 26 P.3d 666 (2001). We decline the invitation to reject the doctrine because it was not used in this case." 33 Kan. App. 2d at 905-906.

In its petition for review and supplemental brief, the Tribe renews the invitation. We decline to accept the invitation because no matter at issue would be affected by the court's consideration of the existing Indian family doctrine. "It is the duty of the courts to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles which cannot affect the matters in issue before the court. [Citation omitted.]" *Miller v.*

*Sloan, Listrom, Eisenbarth & Glassman,* 267 Kan. 245, 262, 978 P.2d 922 (1999).

Judgments of the Court of Appeals and the district court are affirmed.