#25655-a-PER CURIAM

**2011 S.D. 8**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

THE PEOPLE OF THE STATE OF SOUTH DAKOTA,
EX REL. SOUTH DAKOTA DEPARTMENT
OF SOCIAL SERVICES, IN THE MATTER OF
D.W., ABUSED/NEGLECTED CHILD.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
JONES COUNTY, SOUTH DAKOTA

* * * *

HONORABLE MARK BARNETT
Judge

* * * *

MARTY J. JACKLEY
Attorney General

ANN M. HOLZHAUSER
Special Assistant Attorney General
Pierre, South Dakota                          Attorneys for appellee
                                              State of South Dakota.


ELIZABETH MARIA LORINA of
Lorina & Cesna, LLP
Rapid City, South Dakota                      Attorneys for appellant
                                              Oglala Sioux Tribe.

EMILY SOVELL
Onida, South Dakota                           Attorney for appellee
                                              Child D.W.

* * * *

CONSIDERED ON BRIEFS
ON JANUARY 6, 2011

OPINION FILED **03/02/11**

#25655

PER CURIAM

[¶1.] The Oglala Sioux Tribe appeals the circuit court's judgment finding that good cause existed for placement of D.W. (Child) in an adoptive home outside the placement preferences of the Indian Child Welfare Act (ICWA).

**Facts and Procedural Background**

[¶2.] On August 22, 2006, the State filed a petition in Jones County alleging that Child and his half-brother (Brother), then ages six and four months, respectively, were abused and neglected. At the time, Child was living with Mother and T.M., who is Brother's father. Child and Brother were taken into protective custody on December 1, 2006. Following a hearing, the Department of Social Services (DSS) was granted continued temporary custody of the children.

[¶3.] Child and Brother were initially placed in foster care with Brother's paternal grandparents. During the summer of 2007, Child was transported to the home of his maternal great-aunt for respite care. Child later returned to his Brother's paternal grandparents to reside with Brother until a home study could be completed on Child's maternal great-aunt.

[¶4.] In September 2007, the Oglala Sioux Tribe (Tribe) moved to intervene and to transfer jurisdiction to tribal court. The circuit court granted the motion to intervene but denied the motion to transfer. Although the motion to intervene was granted, the Tribe stopped attending the proceedings and played no further role in the case until July 2008.

[¶5.] A final dispositional hearing (termination hearing) was held on February 20, 2008. Neither Mother nor Father attended the hearing, and the court

noted their absence in rendering its decision to terminate their parental rights. In an oral ruling at the close of the hearing, the court found that although Father had no "active part" in any alleged abuse or neglect, he had essentially abandoned Child. The court observed that "even [Child], his son, who apparently has neither heard nor seen from [Father] in the last couple of years[,] describes his situation as, 'I don't have a dad.'" Neither parent appealed the termination of parental rights.

[¶6.]     Following the termination hearing, DSS began searching for a permanent placement for Child that would conform to the placement preferences of ICWA. DSS conducted searches for relatives of Child and for Native American families within South Dakota that might be willing to serve as a permanent placement. DSS also placed Child's name on the AdoptUsKids website as a means to search for licensed families nationwide. DSS sent the Tribe a report summarizing these search efforts.

[¶7.]     During a July 16, 2008, review hearing, the Tribe, through ONTRAC[1] Director Juanita Scherich, requested additional time to conduct its own search for relatives and tribal members who could serve as adoptive parents for Child. The court expressed some concern that no relatives had yet come forward to care for Child but agreed to allow DSS and the Tribe additional time to look for a suitable placement.

[¶8.]     Despite its thorough efforts, DSS was unable to find a relative or Native American family who was willing to adopt Child. It did, however, find a

---

1.     Oglala Nation Tispaye Resources Advocacy Center. This office handles ICWA matters for the Tribe.

family in Michigan (the "Michigan Couple"), who was approved for adoption by the Michigan Indian Child Welfare Agency. One of the Michigan parents was affiliated with the Ottawa Tribe and was active in Native American culture but was not an enrolled member of the Tribe. Additionally, the Michigan Couple had previously adopted four Native American children. All of the children, like Child, had special needs but were happy and well adjusted in the home. DSS selected the Michigan Couple as a suitable placement for Child.

[¶9.]     During an August 11, 2009, review hearing, the Tribe expressed its concern that Father's relatives had not been explored as a possible placement option for Child. DSS acknowledged that, until that point, it had made no effort to explore Father's family because Father's paternity had not been established. The State contended that the circuit court had already made a factual finding that the placement search was compliant with ICWA and argued the Tribe was now too late to contest that finding. The State argued against any further delay in the proceedings when a suitable placement option had already been found in the Michigan Couple. Nevertheless, the court agreed to continue the proceedings until Father's family could be explored as a possible placement option.

[¶10.]     In conjunction with the search, the Tribe provided DSS with a list of Father's relatives and other Native American families who might be interested in adopting Child. Only one person on the list expressed any interest in adopting Child: Father's live-in girlfriend (Girlfriend). DSS did not explore Girlfriend as a placement option because Father's parental rights had already been terminated, and the court had made a factual finding that Father abandoned Child.

[¶11.]     The circuit court held a hearing on March 26, 2010, to determine whether good cause existed to place Child outside the ICWA placement preferences. Child's therapist, Christina Bisek, testified that Child should be placed with a family skilled in dealing with his behavioral disorders, which included Attention Deficit Hyperactivity Disorder and Oppositional Defiant Disorder. Bisek also testified she believed Child would benefit from being the youngest child in the home as it would allow him to receive more attention from the parents. Both of these factors favored placement with the Michigan Couple rather than with Girlfriend.

[¶12.]     The State reiterated its concerns about placing Child with a caregiver whose parental rights had been terminated. Michael Putzier, a supervisor for DSS, testified that, in his experience, he could not recall ever placing a child with a parent whose parental rights had been terminated. Based on Ms. Bisek's conclusions and Putzier's concerns about Father, Putzier recommended that Child be placed with the Michigan Couple.

[¶13.]     Joseph Ashley, a DSS officer specializing in ICWA, also recommended that the court find good cause to deviate from the ICWA placement preferences. Ashley noted the lack of any contact or bonding between Father and Child and indicated that Father's actions in abandoning Child were very harmful to Child under the culture and child-rearing practices of the Tribe. He also concluded that Father's actions were inconsistent with the Tribe's concept of "tiospaye," the caretaking of children by extended family members within the Lakota kinship structure. Ashley recommended placement with the Michigan Couple.

[¶14.] Juanita Scherich, testifying on behalf of the Tribe, stated that the Tribe does not believe in the concept of termination of parental rights and has not allowed for such action in its tribal court since 2005. Scherich stated her belief that Father and Girlfriend would be an appropriate placement for Child because both parents were employed, Girlfriend did not drink, and several of Child's half-siblings resided with the couple. She indicated she had not heard anything negative about Father, although she had not conducted a home study on the proposed placement.

[¶15.] At the conclusion of the hearing, the court found that good cause existed to deviate from the ICWA placement preferences. The court found that Child would likely incur substantial emotional injury if he were placed with Father and that placement with Girlfriend would be equivalent to placement with Father. Because neither DSS nor the Tribe had suggested another ICWA-preferred placement option, the court found good cause to place Child outside the ICWA placement preferences. The Tribe appeals.

### Standard of Review

[¶16.] This Court has not previously addressed the appropriate standard of review for a circuit court's finding of good cause to deviate from the ICWA placement preferences. A majority of jurisdictions has adopted an abuse of discretion standard. *See In re Adoption of F.H.*, 851 P.2d 1361, 1363 (Alaska 1993); *In re Adoption of B.G.J.*, 133 P.3d 1, 9 (Kan. 2006); *In re Custody of S.E.G.*, 521 N.W.2d 357, 363 (Minn. 1994); *In re Adoption of M.*, 832 P.2d 518, 522 (Wash. Ct. App. 1992). In *B.G.J.*, the Kansas Supreme Court stated, "We think the use of the term 'good cause' . . . was designed to provide state courts with some flexibility in

determining the proper placement of Indian children . . . . Because flexibility implies discretion, we will employ an abuse of discretion standard of review." 133 P.3d at 6 (quoting *In re Adoption of B.G.J.*, 111 P.3d 651, 656 (Kan. Ct. App. 2005)).

[¶17.] At least one court has adopted a de novo standard of review for a finding of good cause to deviate from the ICWA placement preferences. *See In re K.R.C.*, 238 P.3d 40 (Or. Ct. App. 2010). The court in *K.R.C.* found it had statutory authority to exercise de novo review. *Id.* at 43. *See* Or. Rev. Stat. § 19.415(3). South Dakota has no statute bearing any similarity to that referenced by the Oregon court. We therefore join the majority of jurisdictions in adopting an abuse of discretion standard of review for a circuit court's decisions to deviate from the ICWA placement preferences.

## Analysis and Decision

*Whether the circuit court erred in finding good cause to deviate from the ICWA adoptive placement preferences.*

[¶18.] The Indian Child Welfare Act, 25 U.S.C. § 1915(a), provides:

> In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.

ICWA does not define "good cause" nor does it state the burden of proof applicable to a finding of good cause to deviate from the ICWA placement preferences. However, the *Guidelines for State Courts: Indian Child Custody Proceedings* (the "BIA Guidelines") suggest that good cause determinations should be based on one or more of the following considerations:

> (1) The request of the biological parents or the child when the child is of sufficient age.
> (2) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.
> (3) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.

44 Fed. Reg. 67584, ¶ F.3 (1979). This list is not considered exhaustive or binding. *In re A.L.*, 442 N.W.2d 233, 236 (S.D. 1989). This Court has considered factors outside the BIA Guidelines in determining good cause in other ICWA matters. *See In re T.I.*, 2005 S.D. 125, ¶ 22, 707 N.W.2d 826, 835 (considering separation of siblings); *In re J.L.*, 2002 S.D. 144, ¶ 19, 654 N.W.2d 786, 791 (considering the best interests of the child). Review of this issue requires that this Court first decide the appropriate burden of proof for a finding of good cause to deviate from the ICWA placement preferences. This Court must then determine whether the circuit court abused its discretion in finding that burden was satisfied in this case.

*Burden of Proof*

[¶19.]     Throughout the proceedings, the circuit court repeatedly expressed its uncertainty as to the burden of proof required to find good cause to deviate from the ICWA placement preferences.[2] On appeal, the State argues that because this is a civil action the burden should be a preponderance of the evidence, although it concedes that some authority exists to suggest the proper burden is clear and convincing evidence. The Tribe has not addressed this issue in its brief.

---

2.     Before announcing its ruling at the conclusion of the Good Cause Hearing, the circuit court stated that its findings of fact were made "beyond a reasonable doubt," thereby assuring its findings would withstand any standard this Court chooses to apply.

[¶20.]    ICWA provides burdens of proof for some determinations, but it does not specify the burden necessary to establish good cause to deviate from its placement preferences. *See* 25 U.S.C. § 1915(b). By comparison, for all foster care placements, ICWA requires a showing of "clear and convincing evidence" that continued custody by the Indian parent is likely to result in serious emotional or physical abuse to the child. *Id*. § 1912(e). A termination of parental rights requires a similar showing but raises the burden of proof to "beyond a reasonable doubt." *Id*. § 1912(f).

[¶21.]    This Court has never squarely addressed this issue. We have, however, addressed the applicable burden of proof for determinations of good cause to deny transfer of jurisdiction to tribal court under ICWA. *T.I.*, 2005 S.D. 125, ¶ 17, 707 N.W.2d at 834. In *T.I.*, we held that to deny transfer to tribal court, good cause must be proven by clear and convincing evidence. *Id*. We noted, "In enacting ICWA, Congress wanted to have Indian tribes determine custody issues involving Indian children." *Id*. We then held, "Considering the firm congressional intent behind ICWA, the standard most consistent with the Act requires clear and convincing evidence of good cause . . . ." *Id*.

[¶22.]    Other courts have applied the clear and convincing evidence standard to findings of good cause to deviate from the ICWA placement preferences. *In re Custody of S.E.G.*, 507 N.W.2d 872, 878 (Minn. Ct. App. 1993); *In re Adoption of Baby Girl B*, 2003 O.K. Civ. App. 24, ¶ 77, 67 P.3d 359, 373 (Okla. Civ. App. 2003). In *Baby Girl B*, the Oklahoma court stated:

> This holding is consistent with the standard of proof applicable
> to subsequent stages where "clear and convincing" or even the

> "beyond a reasonable doubt" standards apply. In addition, use of the "clear and convincing" standard will foster the policy of [ICWA] and the preferences stated therein and will assist with the effort to avoid inadvertent interjection of cultural bias into the proceeding.

*Id*. ¶ 78, 67 P.3d at 374.

[¶23.]    By contrast, it appears that only one court has applied the preponderance of the evidence burden of proof to findings of good cause to deviate from the ICWA placement preferences. *In re Adoption of N.P.S.*, 868 P.2d 934, 936 (Alaska 1994) (citing *In re Adoption of F.H.*, 851 P.2d 1361, 1363 (Alaska 1993)). Other than referencing a state adoption statute, the Alaska court offered little analysis for its application of the more relaxed standard. *See* Alaska Adoption Rule 11.

[¶24.]    The "clear and convincing" standard appears to be the better-reasoned approach. It is consistent with both the congressional intent in adopting ICWA and this Court's precedent. Therefore, we conclude that deviations from the ICWA placement preferences require a showing of good cause by clear and convincing evidence.

*Circuit Court's Finding of Good Cause*

[¶25.]    The circuit court based its finding of good cause primarily on the third factor in the BIA Guidelines. The court found that DSS had conducted a diligent search and no suitable ICWA-preferred placement options had been found. Specifically, the court noted:

> Since the inception of this case in August of 2006, over three and a half years ago, the South Dakota Department of Social Services has conducted diligent searches for an adoptive placement within the preferences set forth in [ICWA] . . . .

> [DSS] has made contact with the minor child's tribe and has contacted known members of the child's extended family, as defined by [ICWA], but has been unable to locate a suitable placement for the children within the preference guidelines . . . . The Court finds that placement of the child within the order of preference as set forth in [ICWA] is not available and that good cause exists for placement of the child with an individual or family outside of said order of preferences . . . .

[¶26.]    The Tribe argues that the court erred in finding DSS had conducted a diligent search for an ICWA-preferred placement.  This finding of fact is reviewed for clear error.  *In re E.M.*, 466 N.W.2d 168, 172 (S.D. 1991).  This Court must determine "not whether it would have made the same findings the [circuit] court did, but whether the entire evidence leaves a definite and firm conviction that a mistake has been committed."  *Id.*

[¶27.]    There is ample evidence in the record to support the circuit court's finding that DSS was diligent in its search.  In its findings of fact, the court detailed the many steps taken by DSS in its search for a suitable adoptive placement.  These steps included numerous contacts with the Tribe's ICWA representatives, Tribal Social Services, and ONTRAC; investigations into several blood relatives, both maternal and paternal; and, broad searches through the use of statewide and nationwide resources.

[¶28.]    The Tribe argues that the DSS search was not diligent because the Department did not conduct a home study on Girlfriend's home.  However, the circuit court made a factual determination that a home study was unnecessary.  The court found that "DSS has appropriately not ordered a home study for [Girlfriend] because she is the live-in girlfriend of Father . . . whose parental rights were terminated at the disposition phase of the proceedings."  The court also noted

that "placement with the parent whose parental rights have been terminated is not in the child's best interest." The record contains sufficient evidence to support this conclusion. The State's ICWA expert testified that Father's abandonment would be harmful to Child and that his actions were inconsistent with the child-rearing practices of the Tribe. We cannot say that the court committed clear error in finding Girlfriend was not a suitable placement for Child.

[¶29.] Aside from Girlfriend, neither DSS nor the Tribe located another viable placement option within the ICWA preferences. DSS explored placement options for over three and a half years, during which time Child was without a permanent home environment. The circuit court was within its discretion to determine that a diligent search had been performed and that a suitable ICWA-preferred placement could not be found. *See* BIA Guidelines, 44 Fed. Reg. 67584, ¶ F.3. The court's findings of fact support its conclusion that at least one of the factors indicating good cause to deviate from the ICWA placement preferences existed in this case. Therefore, the circuit court did not abuse its discretion in finding by clear and convincing evidence that good cause existed to place Child outside the ICWA placement preferences.

[¶30.] Affirmed.

[¶31.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, MEIERHENRY, and SEVERSON, Justices, participating.